UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDGAR L. JOHNSON, JR.,<br>individually and on behalf of all others<br>similarly situated,  and derivatively on<br>behalf of  TOWER BANCORP, INC.,<br><br>                                    Plaintiff,<br><br>v.<br><br>ANDREW    SAMUEL,    CHARLES<br>PEARSON,              CLIFFORD<br>DEBAPTISTE,  JEFFREY   LEHMAN,<br>KENNETH    LEHMAN,    EDWARD<br>LEO,  MICHAEL  PECK,  WILLIAM<br>POMMERENING,  ROBERT  POOLE,<br>TERRY  RANDALL,  HASU  SHAH,<br>KLARE     SUNDERLAND,     AND<br>TOWER BANCORP, INC.<br><br>                                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**Civil Action No.:**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

<u>**CLASS ACTION AND DERIVATIVE COMPLAINT**</u>

Plaintiff, by his attorneys, alleges upon information and belief, except for his

own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this shareholder class and derivative action on behalf

of the public stockholders of Tower Bancorp, Inc. ("Tower" or the "Company")

and on behalf of Tower against Tower's Board of Directors (the "Board" or the

"Individual Defendants") seeking equitable relief for their breaches of fiduciary

duties arising out of their ongoing efforts to sell the Company to Susquehanna Bancshares, Inc. ("Susquehanna") pursuant to an unfair price, an unfair process, and through a materially misleading registration statement.  Additionally, Plaintiff, individually, brings a claim against Defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.     Tower is the parent company of Graystone Tower Bank ("Graystone"), a full-service community bank operating 49 branch offices in central and southeastern Pennsylvania and Maryland through three divisions, Graystone Bank, Tower Bank, and 1N Bank. The company has total assets of approximately $2.6 billion.

3.     On June 20, 2011, Susquehanna and the Company announced a definitive agreement under which Susquehanna will acquire all outstanding shares of Tower common stock in a stock and cash transaction (the "Proposed Transaction"). Under the terms of the Proposed Transaction, shareholders of Tower will have the opportunity to elect to receive either 3.4696 shares of Susquehanna common stock or $28.00 cash for each share of Tower common stock, with $88 million of the aggregate consideration being paid in cash.

4.     The Board has breached their fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more

detail below, the consideration shareholders are to receive is inadequate and significant undervalues the Company.  For example, the average price target for Tower stock among four analysts was $29.63 per share, with at least one analyst setting a price target of $33.00 per share.

5.     Rather than seek a price that was in the best interests of the Company's shareholders, defendants entered into the Proposed Transaction to procure for themselves and other Company insiders significant financial benefits at the expense of the Company's public shareholders.  Upon completion of the Proposed Transaction, defendant Andrew Samuel, the Company's Chairman of the Board and CEO, will become President and Chief Revenue Officer of Susquehanna. Jeffrey Renninger ("Renninger"), Tower President and Chief Operating Officer, and Janak Amin ("Amin"), Graystone Tower Bank CEO, will each assume senior management positions at Susquehanna Bank.  Additionally, Samuel and two other current Tower directors will be appointed to the Susquehanna board of directors.

6.     The Proposed Transaction was the product of a fundamentally flawed process that was initiated and conducted by Tower's senior management, particularly defendant Samuel, to procure for themselves significant financial benefits at the expense of the Company's public shareholders.  As described in more detail below, the Board played virtually no role in the sales process, but

rather permitted the materially conflicted senior management of the Company to spearhead the negotiations with Susquehanna and other potentially interested parties. With Susquehanna promising post-merger employment opportunities for the Company's most senior management from very early in the process, the Board breached its fiduciary duties by, among other things: (a) failing to form a special committee of disinterested directors to oversee and/or participate in the sales process; (b) failing to adequately insulate the process from the biased influence of Samuel and other Company insiders who ultimately negotiated a transaction for their own self interests; (c) agreeing to enter into the Proposed Transaction after having contacted only five potentially interested parties; and (d) failing to adequately pursue an indication of interest submitted by a second financial institution described below, an interest that may have led to increased consideration for the Company's shareholders had it been adequately pursued.

7.     Further, defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the merger agreement dated June 20, 2011 (the "Merger Agreement"), defendants agreed to:   (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirors or even in continuing discussions and negotiations with potential acquirors; and (iii) a

provision that requires the Company to pay Susquehanna a termination fee of $13.5 million in order to enter into a transaction with a superior unsolicited bidder. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives including a sale of all or part of Tower.

8.     In connection with the Proposed Transaction, on August 17, 2011, a Form S-4 Registration Statement and joint proxy statement was filed with the Securities and Exchange Commission ("SEC") by Susquehanna and Tower (the "Preliminary Proxy").   The Preliminary Proxy fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote in favor of the Proposed Transaction. Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder, by omitting material facts necessary to render the Preliminary Proxy non-misleading. Defendants have also breached their fiduciary duty of candor by failing to disclose material information to the Tower shareholders necessary for them to determine whether to vote in favor of the Proposed Transaction.

9.     The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the class he seeks to represent. Without this information,

Plaintiff and the other Tower shareholders will be deprived of their entitlement to make an informed decision on whether to vote in favor of the Proposed Transaction should these misrepresentations and omissions not be cured prior to such vote.

10.    The Individual Defendants have breached their fiduciary duties of loyalty, due care, independence, good faith and fair dealing, and Tower and Susquehanna have aided and abetted such breaches by Tower's officers and directors.  Plaintiff seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of fiduciary duty.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331. The claims asserted herein arise under Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Pennsylvania common law. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

12.    Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially misleading statements and omissions alleged herein.  Defendant Tower is headquartered in this District.

## PARTIES

13.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Tower.

14.     Tower is a corporation organized and existing under the laws of the State of Pennsylvania.  It maintains its principal corporate offices at 112 Market Street, Harrisburg, Pennsylvania 17101.

15.     Defendant Andrew Samuel ("Samuel") has served as a director of the Company since 2009. Samuel has served as Chairman of the Board and CEO of Tower and Chairman of Graystone since January 27, 2011, and as Chairman of the Board, President and CEO of Tower and Graystone from March 31, 2009 to January 27, 2011.

16.     Defendant Charles Pearson ("Pearson") has been a director of the Company since 2010.

17.     Defendant Clifford DeBaptiste ("DeBaptiste") has been a director of the Company since 2010.

18.     Defendant Jeffrey Lehman ("J. Lehman") has been a director of the Company since 2009.

19.     Defendant Kenneth Lehman ("K. Lehman") has been a director of the Company since 2009.

20.     Defendant Edward Leo ("Leo") has been a director of the Company since 2010.

21.     Defendant Michael Peck ("Peck") has been a director of the Company since 2009.

22.     Defendant William Pommerening ("Pommerening") has been a director of the Company since 2011.

23.     Defendant Robert Poole ("Poole") has been a director of the Company since 2009.

24.     Defendant Terry Randall ("Randall") has been a director of the Company since 2006.

25.     Defendant Hasu Shah ("Shah") has been a director of the Company since 2009.

26.     Defendant Klare Sunderland ("Sunderland") has been a director of the Company since 2009.

27.     Defendants referenced in ¶¶ 15 through 26 are collectively referred to as Individual Defendants and/or the Board.

## CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Tower common stock and their successors in interest, except Defendants and their affiliates (the "Class").

29.    This action is properly maintainable as a class action for the following reasons:

(a)    the Class is so numerous that joinder of all members is impracticable.  As of September 16, 2011, Tower has approximately 12.01 million shares outstanding.

(b)    questions of law and fact are common to the Class, including, inter alia, the following:

(i)    Have the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)    Have the Individual Defendants breached their fiduciary duties of candor with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)    Have the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iv)    Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

(vi)    Has Tower aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vii)   Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for

individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy

## DERIVATIVE ALLEGATIONS AND
## DEMAND PURSUANT TO PENNSYLVANIA LAW

30.     Plaintiff also brings this action derivatively in the right and for the benefit of Tower to redress injuries suffered, and to be suffered, by Tower as a direct result of breaches of fiduciary duty by the Individual Defendants.  As to the derivative claims, Tower is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

31.     Pursuant to Pennsylvania law, on July 22, 2011, Plaintiff made a demand upon the current Tower Board of Directors as required under ALI § 7.03(a), Principles of Corporate Governance: Analysis and Recommendations, informing the Board of the identity of the alleged wrongdoers; describing the

factual basis for the allegations of wrongdoing; describing how such wrongdoing is harmful to the Company; and requesting that the Board take remedial action, including without limitation, to ensure that the transaction's consideration is fair to Tower and its shareholders.

32.     Having received no response from the Board, Plaintiff's demand was constructively rejected.  Defendants have already filed a Preliminary Proxy, and a final proxy statement is expected at any time.

33.     In addition, pursuant to Commonwealth law, demand is excused because such a demand would be a futile and useless act that would lead to Tower suffering irreparable injury, particularly for the following reasons:

(a)     Each of the Individual Defendants knew of and/or directly benefited from the wrongdoing complained of herein;

(b)     Defendant Samuel will become President and Chief Revenue Officer of Susquehanna following completion of the Proposed Transaction.

(c)     Samuel and two other current Tower directors will be appointed to the Susquehanna Board following completion of the Proposed Transaction.

(d)     Each member of the Board has been named as a defendant to this lawsuit;

(e)     In order to bring this suit, all of the directors of Tower would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(f)     The acts complained of constitute violations of the fiduciary duties owed by Tower's officers and directors and these acts are incapable of ratification;

(g)     Any suit by the directors of Tower to remedy these wrongs would likely expose the Individual Defendants and Tower to further civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(h)     Each member of the Tower Board is, directly or indirectly, the recipient of remuneration paid by the Company, by virtue of their Board membership, the continuation of which is dependent upon their cooperation with the other members of the Board, and their participation and acquiescence in the wrongdoing set forth herein, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action;

(i)     Because of their association as directors of the Company, the directors are dominated and controlled so as not to be capable of exercising independent objective judgment; and

(j)     The Company's directors' and officers' liability insurance coverage prohibits directors from bringing suits against each other.  Thus, if the Individual Defendants caused the Company to sue its officers and directors for the liability asserted in this case, they would not be insured for that liability.  This they will not do.   The Company's officers' and directors' liability insurance was purchased and paid for with corporate funds for the protection of the corporation.  This derivative action does not trigger the "insured vs. insured" exclusion, and therefore only this derivative action can obtain a recovery from the Company's officers' and directors' insurance for the benefit of the corporation.

## FURTHER SUBSTANTIVE ALLEGATIONS

34.    Tower is the parent company of Graystone, a full-service community bank operating 49 branch offices in central and southeastern Pennsylvania and Maryland through three divisions, Graystone Bank, Tower Bank, and 1N Bank. The Company has total assets of approximately $2.6 billion.

35.    Tower has recently expanded through a number of acquisitions. On March 31, 2009, Tower completed a merger with Graystone Financial Corp. and on December 10, 2010, Tower completed the acquisition of First Chester County Corporation.

36.    In both assets and deposits, Tower has grown significantly in each year since 2005 and is poised for even more growth.





37.    In addition, Tower has significant growth opportunities. As touted by the Company in an investor presentation dated May 24, 2011, the Company has "attractive growth" opportunities in both Pennsylvania and Maryland:



38.    Despite their solid foot and growth opportunities, in a press release dated June 20, 2011, the Company announced that it had entered into a merger agreement with Susquehanna pursuant to which Susquehanna will acquire all of the outstanding shares of the Company in a stock and cash transaction. The Proposed Transaction is expected to be completed in the first quarter of 2012.

39.    Under the terms of the Proposed Transaction, Tower shareholders will have the option of receiving either 3.4696 shares of Susquehanna common stock or $28.00 in cash for each share of Tower common stock. The Merger Agreement

provides that a Tower shareholder may receive a combination of cash and shares of Susquehanna common stock that is different than what he or she may have elected, however, depending on the elections made by other Tower shareholders, in order to ensure that the total cash consideration paid to Tower shareholders at the effective time of the Proposed Transaction is $88,000,000.

40.    The Proposed Transaction consideration is inadequate. The Proposed Transaction will provide significant benefits to Susquehanna and its shareholders. The Proposed Transaction will enhance Susquehanna's already strong presence in central and southeastern Pennsylvania, and will significantly increase its market share in the attractive Pennsylvania counties of Chester, Dauphin and Franklin. Additionally, the Proposed Transaction will give Susquehanna branch presence in the Pennsylvania counties of Lebanon, Fulton and Centre. Including Susquehanna's pending acquisition of Abington Bancorp ("Abington"), the combined company will have approximately $17.8 billion in assets and will be the largest bank in deposit market share and branch count among independent banks that have more than 90% of their deposits in Pennsylvania, Maryland and New Jersey. Susquehanna will be the largest community bank in Pennsylvania after the mergers of Tower and Abington are closed. The combined company will also secure Susquehanna a top three market-share position in 14 of the counties it serves.

41.     Susquehanna expects the Proposed Transaction to be immediately accretive to EPS, 10% accretive to 2013 EPS, and include annual cost savings of approximately $30 million.    As stated by William J. Reuter, Susquehanna's Chairman and Chief Executive Officer, in a conference call discussing the Proposed Transaction:

> The merger is expected to provide superior financial results to Susquehanna shareholders driven by the growth opportunities Tower markets present as well as by cost savings expected through consolidating the branch networks. We project internal rate of return of approximately 25%. We anticipate the transaction will be immediately accretive and 10% accretive to the 2013 earnings per share and will have tangible earn back period of approximately five years.

Despite the significant synergies inherent in the transaction for Susquehanna, however, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Susquehanna.

42.     Further, according to Yahoo Finance, the average price target for Tower stock among four analysts was $29.63 per share, with at least one analyst setting a price target of $33.00 per share.

43.     Accordingly, given the Company's solid footing, growth prospects, analyst expectations, and benefits provided to Susquehanna shareholders, the Proposed Transaction consideration is inadequate and undervalues the Company.

44.     In addition, following the announcement of the Proposed Transaction, the price of Susquehanna stock has gone down considerably, further eroding the

value that Tower shareholders will receive in the Proposed Transaction. For example, based on the $6.42 closing price of Susquehanna shares on September 16, 2011, the 3.4696 exchange ratio equates to a value of just $22.27 per share.

***Tower's Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Proposed Transaction Not Available to Tower's Public Shareholders***

45.    The Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Tower's public shareholders.

46.    First, upon consummation of the Proposed Transaction, defendant Samuel will become President and Chief Revenue Officer of Susquehanna. Pursuant to the new employment agreement entered into between Samuel and Susquehanna, Samuel will receive, among other benefits, a base salary of $550,000 a year and a retention payment on the first anniversary of the effective time of the merger equal to $2,605,649.

47.    Jeffrey Renninger, Tower President and Chief Operating Officer, and Janak Amin, Graystone Tower Bank CEO, will each become a senior vice president of Susquehanna and executive vice president of Susquehanna Bank upon consummation of the Proposed Transaction.  As part of their new employment agreements with Susquehanna, in addition to their base salaries, both Renninger

and Amin will each receive a retention payment on the first anniversary of the effective time of the merger equal to $1,018,496.

48.     Additionally, Samuel and two other current Tower directors will be appointed to the Susquehanna board of directors, and one of these appointees will also be appointed to the executive committee of Susquehanna's board of directors.

49.     In addition, as stated in the Preliminary Proxy, "In consideration of their willingness to serve on Tower's existing regional advisory boards (which Susquehanna intends to continue) for a period of one year following completion of the merger, Susquehanna has consented to a one time cash payment by Tower of $36,600 to each member of Tower's board of directors who is not appointed to the Susquehanna board of directors, which Tower may pay immediately prior to the effective time of the merger."

50.     The Company's directors and executive officers hold restricted stock units and unvested stock options of the Company that, pursuant to the Merger Agreement, will automatically vest and/or no longer be subject to restrictions upon consummation of the Proposed Transaction. The following chart shows the amount of unvested stock options and restricted stock awards held by the Company's officers and directors:

| Executive/Director | Number of Unvested Stock Options[1] | Number of Unvested Restricted Stock Awards |
|---|---|---|
| Andrew Samuel | 8,880 | 4,000 |
| Mark Merrill | 3,440 | 1,500 |
| Jeffrey Renninger | 4,320 | 2,000 |

| | | |
|---|---|---|
| Janak Amin | 4,320 | 2,000 |
| Jane Tompkins | 1,920 | 1,500 |
| Carl Lundblad | 1,920 | 1,500 |
| All executive officers as a group (six persons) | 24,800 | 12,500 |
| All non-employee directors as a group (11 persons) | 14,400 | 6,300 |

51.     In addition, Tower officers Mark Merrill, Jane Tompkins, and Carl Lundblad are entitled to receive substantial severance payments should they be terminated without cause following consummation of the Proposed Transaction. The following chart shows the dollar value of the various elements of compensation, including the vesting of previously restricted stock and unvested stock options as well as the retention payments described above, that each executive officer of Tower would become entitled to receive upon consummation of the Proposed Transaction:

| Executive Name | Cash | Equity | Pension/ NQDC | Perquisites/ Benefits | Tax Reimbursement | Other | Total |
|---|---|---|---|---|---|---|---|
| Andrew Samuel | — | $122,922[8] | $105,805[14] | — | — | $2,726,899[20] | $2,955,626 |
| Jeffrey Renninger | — | $ 61,314[9] | $ 87,381[15] | — | — | $1,076,196[21] | $1,224,891 |
| Janak Amin | — | $ 61,314[10] | $ 99,814[16] | — | — | $1,076,196[22] | $1,237,324 |
| Mark Merrill | $727,628[7] | $ 46,231[11] | $ 51,319[17] | $ 28,434 | $ 343,411 | $ 41,125 | $1,209,714 |
| Jane Tompkins | $667,144[7] | $ 44,362[12] | $ 46,175[18] | $ 24,884 | $ 307,513 | $ 38,588 | $1,103,782 |
| Carl Lundblad | $638,144[7] | $ 44,362[13] | $ 43,972[19] | $ 27,760 | $ 297,342 | $ 36,750 | $1,088,330 |

52.     Based on the above, the Proposed Transaction is unfair to Tower's public shareholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.

***The Board Abdicated its Fiduciary Duties While Allowing Company Insiders to Structure a Sale for their Own Financial Benefits and to the Detriment of the Company's Public Shareholders***

53.    The Proposed Transaction was the product of a fundamentally flawed process that was initiated and conducted by Company insiders, particularly defendant Samuel, to procure for themselves significant financial benefits, including the senior management positions with Susquehanna described above, at the expense of the Company's public shareholders.

54.    As described in more detail below, the Board played virtually no role in the sales process, but rather permitted the materially conflicted senior management of the Company to spearhead the negotiations with Susquehanna and other potentially interested parties. With Susquehanna promising post-merger employment opportunities for the Company's most senior management from very early in the process, the Board breached its fiduciary duties by, among other things: (a) failing to form a special committee of disinterested directors to oversee and/or participate in the sales process; (b) failing to adequately insulate the process from the biased influence of Samuel and other Company insiders; (c) agreeing to enter into the Proposed Transaction after having contacted only five potentially interested parties; and (d) failing to adequately pursue the indication of interest submitted by the second financial institution described below, an interest that may have led to increased consideration for the Company's shareholders.

55.    On March 18, 2011, at a banking industry conference, defendant Samuel and William J. Reuter ("Reuter"), Chairman and Chief Executive Officer

of Susquehanna, discussed the potential for future consolidation in the Mid-Atlantic region in which both companies operate in.   Thereafter, on March 24, 2011, Tower's senior management met and discussed, among other things, the possibility of affiliating with a Mid-Atlantic regional financial institution.

56.   On March 29, 2011, Samuel met with Keefe, Bruyette & Woods, Inc. ("KBW"), the Company's financial advisor, and instructed KBW to begin to consider potential merger partners for Tower, including Susquehanna.  It appears that Samuel made this determination to initiate a sales process without Board approval.

57.   Thereafter, before any other parties were contacted, on April 4, 2011, Samuel and Reuter again met and discussed the potential merits of a business combination of Tower and Susquehanna, a deal which ultimately concluded in post-merger employment agreements for Samuel and other Company insiders.

58.   On April 12, 2011, Tower entered into an engagement letter with KBW to act as Tower's financial advisor with respect to a sale of Tower. Over the following weeks, senior management of the Company and KBW undertook a very limited sales process, again with virtually no involvement by the Board.

59.   First, as stated in the Preliminary Proxy, "on April 12, 2011, representatives of KBW met with Tower's executive management to gather information in order to assist Tower in developing a confidential information

memorandum for distribution to the parties identified as potential partners." Representatives of KBW again met with Tower's executive management on April 19, 2011 and further developed and refined the proposed confidential information memorandum.

60.     In addition, on April 19, 2011, and again with no input by the Board, Samuel and KBW developed the list of five prospective partners to contact. As stated in the Preliminary Proxy, "Samuel and a representative of KBW discussed the process of soliciting indications of interest from potential merger partners and developed a list of five prospective partners perceived as most likely to have both a strong strategic interest in Tower and the ability to make an attractive proposal in the event the Tower board determined to pursue a business combination." Thereafter, on April 20, 2011, KBW contacted these five institutions hand-picked by Samuel, including Susquehanna, to discuss their interest in a pursuing a potential business combination with Tower.

61.     On May 4, 2011, Samuel and Reuter again met and discussed the potential combination of Tower and Susquehanna. The "corporate and management structure" of the combined company, which ultimately involved post-merger employment agreements for Samuel, Renninger, and Amin, was discussed at this meeting.

62.     On May 17, 2011, Susquehanna submitted a non-binding indication of interest where it proposed to pay $27.00 to $30.00 per share for each share of Tower's common stock in an all stock or stock and cash transaction for an approximate deal value of $325 million to $360 million. As stated in the Preliminary Proxy, Susquehanna's proposal "*also contemplated Messrs. Samuel, Renninger and Amin continuing in senior management roles with Susquehanna and the appointment of three Tower directors to the Susquehanna board of directors*."

63.     On May 19, 2011, the Company received a preliminary indication of interest letter from a second financial institution, providing for a valuation of Tower of approximately $25.00 per share, an offer which was subsequently increased to $30.00 per share that same day. As stated in the Preliminary Proxy, "*this proposal did not include any commitment regarding continued involvement in the combined organization by Tower management or directors.*"

64.     During the following weeks, both Susquehanna and the second financial institution performed due diligence on Tower, which included discussions between Tower's executive management and the executive management of each of the two interested parties.

65.     Following due diligence, on June 8, 2011, the second institution submitted  a revised indication of interest to acquire the Company for a total

consideration of $321.1 million, representing a purchase price of $26.77 per share, and contemplating an all-stock transaction with a fixed exchange ratio. It should be noted that the $26.77 value currently equates to more than the value of the stock component of the Proposed Transaction consideration. As described above, based on the $6.42 closing price of Susquehanna shares on September 16, 2011, the 3.4696 exchange ratio equates to a value of just $22.27 per share.

66.   In the evening of June 9, 2011, Susquehanna delivered a revised indication of interest to the Company providing for total consideration of $336 million payable in the form of either $28.00 per share in cash or 3.4696 shares of Susquehanna's common stock.

67.   With employment opportunities for the Company's insiders ensured in the Susquehanna offer, it is not surprising that the Company's insiders made no effort to seek a higher bid from the second institution.   Following receipt of the revised indication of interest from Susquehanna, there is no indication that KBW or any Company representatives approached the second institution to seek a higher offer. Despite the only $15 million difference between the two offers, on January 10, 2011, the Board met and determined to approve the deal with Susquehanna.

68.   Over the following 10 days, Susquehanna and Tower negotiated and finalized the terms of the Merger Agreement. On June 20, 2011, the Tower board met and approved the adoption of the Merger Agreement at an unfair price.

69.   Given Tower's then current and future prospects, the merger process was critical to achieving the best, most sound result for Tower and its shareholders. The Board was duty-bound to conduct this process free from the influence of the personal motivations of Samuel and other Company insiders.  As such, the Board breached its fiduciary duties by itself engaging in self-dealing and by allowing Tower's most senior managers to self-deal.

**The Preclusive Deal Protection Devices**

70.   In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

71.   Section 7.3(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Susquehanna.  Section 7.3(c) demands that the Company terminate any and all prior or on-going discussions with other potential acquirors.

72.   The Merger Agreement also provides that a termination fee of $13.5 million must be paid to Susquehanna by Tower if the Company decides to pursue a competing unsolicited offer, thereby essentially requiring that the competing

bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

73.    Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

***The Materially Misleading and Incomplete Preliminary Proxy***

74.    On August 17, 2011, Susquehanna filed the Preliminary Proxy with the SEC in connection with the Proposed Transaction.  The Preliminary Proxy fails to provide the Company's shareholders with material information and provides them with materially misleading information thereby rendering the shareholders unable to make an informed decision regarding whether to vote in support of the Proposed Transaction.

75.    The Preliminary Proxy fails to disclose the projections of Tower's and Susquehanna's senior management teams that were provided to KBW and to J.P. Morgan ("JP Morgan", Susquehanna's financial advisor), respectively, for use in their fairness opinions.

76.    The Preliminary Proxy fails to disclose the following projections and key inputs regarding the *Discounted Cash Flow Analysis* of Tower conducted by KBW:

> (a) the free cash flow projections for years 2011 through 2016 used by
>     KBW in the analysis, the calculations made by KBW to derive the

Company's free cash flows (including all line items necessary to calculate the Company's free cash flows), and the reasons KBW only used Tower management's earnings estimates for years 2011 through 2013, but not for additional years; and

(b) the criteria used to select the long-term tangible asset growth rate of 4.0% used in the analysis, the reasons 2016 was selected as the terminal year, the criteria and key inputs used to select the discount rates range of 12.0% to 16.0% used in the analysis, and the criteria used to select the 10.0 times to 13.0 times terminal value multiples used in the analysis.

77.    The Preliminary Proxy states that the financial data prepared by KBW and used in its *Selected Analyses* "may not correspond to the data presented in Tower's and Susquehanna's historical financial statements…," but fails to disclose how such financial data differed or failed to correspond to the data presented in Tower's and Susquehanna's historical financial statements, including disclosure of the "different periods, assumptions and methods used by KBW" in the analysis.

78.    The Preliminary Proxy Statement fails to disclose the criteria used by KBW to determine which transactions to include in the *Comparable Transactions Analysis*, the date of each transaction and the multiples observed for each transaction, and the conclusions drawn by KBW from the analysis.

79.    The Preliminary Proxy fails to disclose the "assumptions regarding the accounting treatment, acquisition adjustments and cost savings" made by KBW to calculate the financial impact that the merger would have on certain projected financial results of Susquehanna in the *Financial Impact Analysis*, the earnings

estimates for Susquehanna and Abington for years 2012 and 2013 used in the analysis, and the amount of dilution observed in the analysis.

80.    The Preliminary Proxy also fails to disclose material information concerning the Board's consideration of the two competing offers and the reasons it determined to pursue the Susquehanna proposal over the proposal of the second financial institution, including:

(a) the "historical financial performance of each party and the potential financial impact of a transaction on each prospective partner" that was reviewed by the Board on May 20, 2011.

(b) the summary and analysis of the two proposals considered by the Board on June 10, 2011, including "financial terms contained within each proposal" and the "non-financial terms of each proposal, including representations with respect to existing employment contracts, continued management involvement, employee severance, required approvals and timing for completion of the transaction," and the "potential opportunity for management and board influence in a combined organization, and the perceived impact on Tower's employees and local communities;"

(c) the reasons the Board determined on June 10, 2011 to negotiate a definitive merger agreement with Susquehanna as opposed to the second financial institution; and

(d) whether the Company contacted the second financial institution following the Board's determination to negotiate a definitive merger agreement with Susquehanna on June 10, 2011 in order to seek a higher bid from the second financial institution, and if not, the reasons for not doing so.

81.    The Preliminary Proxy also fails disclose the material information concerning the process conducted by the materially conflicted Company insiders,

as well as information pertaining to the Board's lack of involvement in the sales process. The Proxy should disclose the following information:

(a) The existence and the nature of any relationship between defendant Samuel and Reuter, prior to their meeting on March 18, 2010, and whether they discussed the consolidation of the two companies at this meeting.

(b) The reasons for, on March 29, 2011, defendant Samuel authorizing KBW to "consider potential merger partners for Tower, including Susquehanna, and other regional financial institutions," without Board discussion or approval.

(c) Whether, at the April 5, 2011 special meeting of the Board, defendant Samuel disclosed that he had engaged in preliminary discussions with Susquehanna, concerning the potential merits of a business combination of Tower and Susquehanna.

(d) Regarding the process of soliciting indications of interest from potential merger partners discussed during the April 19, 2011 meeting between KBW and Tower's executive management, the criteria used to develop "a list of five prospective partners perceived as most likely to have both a strong strategic interest in Tower and the ability to make an attractive proposal in the event the Tower board determined to pursue a business combination," the rationale behind limiting the list of potential partners to only five, and the reasons the Board did not participate in selecting potential parties to contact.

(e) Whether defendant Samuel reported to the Board his previous meetings with KBW and Reuter, Chairman and Chief Executive Officer of Susquehanna.

(f) The circumstances on April 18, 2011 that led Susquehanna to hire a financial advisor "should Susquehanna determine to pursue a business combination with Tower in the near future" prior to the time that KBW contacted Susquehanna concerning such proposal.

(g) The number and nature of parties contacted by KBW to assess their interest in acquiring the Company, including, without limitation, whether KBW contacted potential financial buyers or any strategic buyer without the Mid-Atlantic regional area.

(h) The substance of Board discussions concerning defendant Samuel's potential conflicts of interest and the possible effect those conflicts would have on the negotiation transaction negotiation process, including, without limitation, whether defendant Samuel was an appropriate person to negotiate a business combination on behalf of Tower with potential partners.

(i) In the context of its authorizing defendant Samuel and KBW to shop the Company and of the May 4, 2011 meeting among Messrs. Samuel and Reuter without the presence of any independent Board member or KBW, describe the process and parameters the Board conveyed to defendant Samuel about any such meeting with a potential partner.

(j) The "corporate and management structure" that was discussed between Samuel and Reuter on May 4, 2011.

(k) The criteria for identifying the additional institution contacted by KBW on or around May 9, 2011, and the reasons for contacting only one additional institution.

(l) The reasons provided by three of the five financial institutions contacted by KBW that they would not be submitting indications of interest.

(m) Having authorized KBW to shop the Company in April, 2011, why the Board waited to contact independent legal counsel until its May 20, 2011 special meeting.

(n) Whether the second financial institution was granted access to Tower's loan portfolio during its due diligence process.

(o) Any discussions among the Board concerning any perceived conflict on the part of defendant Samuel, and whether the Board

considered having defendant Samuel recuse himself from the vote on the transaction at the Board's June 20, 2011 meeting.

82.    The Preliminary Proxy should also disclose the following information:

    (a) The "recent and anticipated changes in laws and regulations affecting the financial services industry" as well as the "expected impact of such changes on future revenues, expenses and capital requirements" of Tower.

    (b) The "available alternatives" that were discussed by Tower's senior management on March 24, 2011 and why consideration of affiliation was limited to "Mid-Atlantic regional financial institutions."

    (c) The "updated financial projections for Tower for the first quarter of 2011 and through December 31, 2013" that were presented to the Board on April 5, 2011.

    (d) The "various factors" the Board considered when evaluating Tower's strategic alternatives at the Board's April 26, 2011 meeting.

    (e) The synergies considered by and relied on by the Board in its Reasons for the Merger.

    (f) The impact on the fairness opinion rendered by KBW if Susquehanna's merger with Abington was not successfully completed.

    (g) The impact on the fairness opinion rendered by JP Morgan if Susquehanna's merger with Abington was not successfully completed.

    (h) The fees received by KBW for its services as book running managing underwriter in connection with a public offering of common stock and a public offering of cumulative trust preferred securities by Susquehanna.

(i) The reasons the Tower Board agreed to a fixed exchange ratio, and chose not to negotiate a collar to prevent the value of the consideration from decreasing below a certain amount.

83.     The Preliminary Proxy also fails to, but should, disclose how the Board retained KBW to assist with the Board's strategic process and the amounts Tower paid to KBW for other engagements in the previous two (2) years. The Preliminary Proxy should also disclose why the Board failed to consider any financial advisor other than KBW, while knowing that KBW had been actively involved in prior Susquehanna transactions.

84.     The Preliminary Proxy should disclose any discussions between and among Tower management, the Tower Board and Susquehanna regarding the termination and/or retention of Tower employees in connection with the Proposed Transaction. The Preliminary Proxy fails to disclose the substance of all discussions of the Tower Board of the impact of the merger on: (a) Tower employees; (b) Tower depositors; (c) Tower creditors (d) Tower shareholders; (e) the communities in which Tower operates.

85.     The Preliminary Proxy should disclose the identity of each Tower director whom Susquehanna will nominate to its board of directors and the compensation and or equity in Susquehanna each of those nominees stands to earn as a result their nomination.

86.    The Preliminary Proxy fails to disclose whether Tower and or its representatives discussed with the "second institution" or any other potential partner the nomination of any member of the Board to its board of directors and/or whether it offered to continue Tower's regional advisory boards on which members of the Board served.  Disclose, too, the substance of any such discussion.

87.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## LOSS CAUSATION

88.    Defendants' material omissions in the Preliminary Proxy have substantially contributed to the economic loss that Plaintiff and the members of the class have incurred in being asked to vote in favor of the Proposed Transaction.

89.    Plaintiff and the Class are being asked to vote in support of the Proposed Transaction pursuant to the Preliminary Proxy.  As detailed above, the Recommendation Statement fails to provide Tower shareholders with material information necessary for them to make an informed decision regarding whether or not to vote in favor of the Proposed Transaction.

90.    It is pursuant to this Preliminary Proxy that shareholders are being asked to determine whether they believe the insufficient stock/cash consideration of either $28.00 per share or 3.4696 shares of Susquehanna common stock (which,

as of September 16, 2011, equates to a value of $22.27 per share) is fair and adequate.

91.    The average price target for Tower stock among four analysts was $29.63 per share, with at least one analyst setting a price target of $33.00 per share.

92.    In addition, as described above, the Proposed Transaction price does not adequately take into account the Company's recent strong performance, its growth prospects, and the benefits the Proposed Transaction will provide to Susquehanna shareholders.

93.    Thus, this Preliminary Proxy soliciting Tower's shareholders support and containing material omissions demonstrates that the Board has accepted an insufficient price for the Company and is recommending that shareholders do the same while failing to provide them with all information necessary to make a decision regarding whether or not to vote in favor of the Proposed Transaction.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Brought Individually Against Individual Defendants)

94.    Plaintiff repeats all previous allegations as if set forth in full herein.

95.    Plaintiff brings this claim individually and not on behalf of the class.

96.    Defendants have issued the Preliminary Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

97.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

98.     Specifically, the Preliminary Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

99.     The misrepresentations and omissions in the Proxy are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### For Breach of Fiduciary Duties Against the Individual Defendants
### Brought Derivatively on Behalf of Tower

100.    Plaintiff repeats all previous allegations as if set forth in full herein.

101.   The Individual Defendants have violated the fiduciary duties of care, loyalty, good faith, and independence owed to Tower and have acted to put their personal interests ahead of the interests of Tower.

102.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value inherent in and arising from Tower.

103.   The Individual Defendants have violated their fiduciary duties by entering Tower into the Merger Agreement without regard to the effect of the Proposed Transaction on Tower and Tower's shareholders.

104.   By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Tower, Plaintiff and the other members of the Class.

105.   As a result of the Individual Defendants' unlawful actions, Plaintiff and the other members of the Class will be irreparably harmed in that they will not receive their fair portion of the value of Tower's assets and operations. Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Tower, Plaintiff and the members of the Class, will not engage in arm's-length negotiations on the Proposed

Transaction terms and may consummate the Proposed Transaction, all to the irreparable harm of the members of the Class.

106.   Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT III
### For Breach of Fiduciary Duty of Candor Against the Individual Defendants Brought Derivatively on Behalf of Tower

107.   Plaintiff repeats all previous allegations as if set forth in full herein.

108.   The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Tower's shareholders.

109.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

110.   As a result, Plaintiff and the Class members are being harmed irreparably.

111.   Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
## Aiding and Abetting
## (Against Tower)

112.   Plaintiff repeats all previous allegations as if set forth in full herein.

113.   As alleged in more detail above, Defendant Tower has aided and abetted the Individual Defendants' breaches of fiduciary duties.

114.   As a result, Plaintiff and the Class members are being harmed.

115.   Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)   declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)   declaring that the Preliminary Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act;

(C)   enjoining, preliminarily and permanently, the Proposed Transaction;

(D)   in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding the Company, the Plaintiff and the Class rescissory damages;

(E)    directing that Defendants account to the Company, Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)    granting the Company, Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated:  September 26, 2011

**FARUQI & FARUQI, LLP**

By:   s/ Michael J. Hynes
        Michael J. Hynes (Bar No. 62702)
        Jacob A. Goldberg
        Sandra G. Smith
        101 Greenwood Avenue, Suite 600
        Jenkintown, PA 19046
        Tel: 215-277-5770
        Fax: 215-277-5771

Of Counsel:
LEVI & KORSINSKY LLP
Donald J. Enright, Esq.
1101 30th Street, NW
Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax:(202) 333-2121

## VERIFICATION

I, Edgar L. Johnson, Jr., under penalties of perjury, hereby do declare that I am a plaintiff in the foregoing complaint, that I have read the complaint, and that the facts therein are true to my own knowledge, except to matters stated therein to be alleged upon information and belief, and as to those matters, I believe them to be true and correct to the best of my knowledge, information, and belief.

Dated: September 23, 2011

Edgar L. Johnson, Jr.